968 P.2d 215

**Brenda CALDWELL and Robyn Caldwell, heirs and surviving parents of Patrick Caldwell, Deceased, Plaintiffs–Appellants–Cross–Respondents,**

v.

**IDAHO YOUTH RANCH, INC., Defendant–Respondent– Cross–Appellant,**

and

**State of Idaho, Department of Health and Welfare, Defendant.**

No. 23474.

Supreme Court of Idaho, Pocatello, May 1998 Term.

Oct. 16, 1998.

Rehearing Denied Dec. 8, 1998.

Goicoechea Law Offices, Chdt., Idaho Falls, for appellant. Allen H. Browning argued.

Moore, Baskin & Parker, Boise, for respondent. Paige A. Parker argued.

SILAK, Justice.

This is a wrongful death action instituted by appellants Brenda and Robyn Caldwell (Caldwells) to recover damages for the slaying of their son, Patrick Caldwell, a minor, by Santiago Espinoza (Espinoza), also a minor, in April 1994. The Caldwells seek to impose vicarious liability on the respondent Idaho Youth Ranch, Inc. (Youth Ranch). The district court granted the Youth Ranch's motion for summary judgment dismissing the case. Additionally, the district court denied the Youth Ranch's request for attorney fees. We affirm the decision of the district court.

## I.

### FACTS AND PROCEDURAL BACKGROUND

Espinoza had a history of juvenile problems starting when he was 10 years old. These problems mostly consisted of battery offenses involving other youths. In December 1991, Espinoza was petitioned into Juvenile Court for first-degree burglary of a Jeep Cherokee and entering a Ford Escort. In March 1992, Espinoza was charged with willful concealment for taking two packs of gum and one box of men's cologne. In February 1992, at age 13, Espinoza was petitioned into Juvenile Court on three counts involving malicious injury to property for breaking five windows in a building and two curfew violations. Espinoza was committed to the custody of the Department of Health and Welfare (Department) and was ordered to be admitted to the Youth Ranch. He was also placed on probation for two years. Espinoza and his father voluntarily agreed to his placement at the Youth Ranch beginning on August 28, 1992.

Upon his arrival at the Youth Ranch, Espinoza underwent a psychological assessment and was identified as having anger management problems. A treatment plan was therefore drawn to help Espinoza with these tendencies. Espinoza had to be physically restrained 20 times in his last four months at the Youth Ranch as a result of altercations with other peers and staff members. Although Espinoza did not fully complete his case plan, he was released from the Youth Ranch into his father's custody in January 1994. His release was the result of a joint decision by the Department and the Youth Ranch.

Approximately three months after his release from the Youth Ranch, in April 1994, Espinoza stabbed to death seventeen-year-old Patrick Caldwell. This brutal murder occurred after Espinoza

found Caldwell standing next to the car Espinoza and I.R. [Espinoza's friend] were planning to drive. There [was] some uncertainty as to whether Caldwell was in the car or was standing next to it. Caldwell evidently said something that made Espinoza angry. Espinoza and I.R. hit Caldwell several times with their fists. Espinoza then stabbed Caldwell seventeen times. Several of the wounds were to Caldwell's head and were hard enough to crack his skull. The remaining knife wounds were to Caldwell's torso, front shoulders and left side of his upper body.

*State v. Espinoza*, 127 Idaho 194, 195, 898 P.2d 1105, 1106 (Ct.App.1995). At the time Espinoza murdered Patrick Caldwell, Espinoza was under the influence of alcohol and marijuana. *Id.* Espinoza thereafter pled guilty to second degree murder and was sentenced to life in prison, with twenty-five years fixed. This sentence was affirmed by the Court of Appeals. *Id.* at 197, 898 P.2d at 1107.

On November 3, 1995, Patrick Caldwell's mother, Brenda Caldwell, filed a wrongful death action against the Department. On March 5, 1996, Brenda was allowed to amend the complaint by joining Patrick's father, Robyn Caldwell, as a plaintiff, and by adding the Youth Ranch as a defendant.

On August 8, 1996, both the Department and the Youth Ranch filed motions for summary judgment. After a hearing, the district court granted both motions, ruling that there was no dispute that Espinoza never made any oral or written comments or threats that he was going to kill anyone when he was released. With respect to the Department, the court ruled that the Caldwells failed to establish reckless, wanton and willful conduct on the part of the Department and that without such proof, the Department was immune under Idaho Code §§ 6–904A and 6–904C(2). With respect to the Youth Ranch, the court ruled that since Espinoza was not in the care, custody, supervision or control of the Youth Ranch when he murdered Patrick Caldwell, and because there was "no genuine issue of fact regarding any propensity on the part of Santiago Espinoza to commit murder or inflict serious intentional physical harm upon another while he was a resident at the Idaho Youth Ranch," the Youth Ranch did not owe any duty to the Caldwells. The court denied the Department's and the Youth Ranch's request for attorney fees and costs. The Caldwells filed a motion to reconsider and to alter or amend the judgment which the district court denied.

The Caldwells and the Department stipulated to dismiss the Caldwell's appeal and the Department's cross-appeal prior to the issuance of this opinion. Therefore, this opinion involves only the Caldwells and the Youth Ranch. The Caldwells appeal the district court's order granting summary judgment in favor of the Youth Ranch, and the denial of their motion to reconsider. The Youth Ranch cross-appeals the court's denial of its request for attorney fees and costs.

## II.

### ISSUES ON APPEAL

The Caldwells present the following issues on appeal:

1. Did the district court err in granting summary judgment in favor of the Youth Ranch?

2. Are the Caldwells entitled to attorney fees on appeal?

The Youth Ranch raises the following issues on cross-appeal:

3. Did the trial court err in denying the Youth Ranch costs and/or attorney fees?

4. Is the Youth Ranch entitled to attorney fees on appeal because the Caldwells have pursued this appeal frivolously, unreasonably and without foundation?

## III.

## ANALYSIS

### A. Standard Of Review.

This Court's standard of review on an appeal from an order granting summary judgment is the same as the standard used by the district court in ruling on a motion for summary judgment. *State v. Rubbermaid Inc.*, 129 Idaho 353, 355–56, 924 P.2d 615, 617–18 (1996); *Thomson v. Idaho Ins. Agency, Inc.*, 126 Idaho 527, 529, 887 P.2d 1034, 1036 (1994). Upon review, all disputed facts are to be liberally construed in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. *Rubbermaid*, 129 Idaho at 356, 924 P.2d at 618. Summary judgment is appropriate if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c); *Harris v. State Dep't of Health and Welfare*, 123 Idaho 295, 297, 847 P.2d 1156, 1158 (1992).

### B. Summary Judgment Was Properly Granted By The District Court In Favor Of The Youth Ranch As No Material Factual Issues Were In Dispute.

█ The district court granted the Youth Ranch's summary judgment motion finding that the Youth Ranch did not owe a duty to the Caldwells. In *Sterling v. Bloom*, 111 Idaho 211, 723 P.2d 755 (1986), this Court recognized a duty owed by those in charge of persons who are dangerous or who have dangerous propensities. In describing this duty the Court relied upon Dean Prosser:

"The general duty which arises in many relations to take reasonable precautions for the safety of others may include the obligation to exercise control over the conduct of third persons.... *[Some] relationships are custodial by nature, requiring the defendant to control his charge and to guard other persons against his dangerous propensities.... The same rule has been applied to hospitals and psychotherapists who have charge of dangerous mental patients, and to those who have charge of dangerous criminals. ...* Yet, in the absence of the *requisite relationship*, there generally is no duty to protect others against harm from third persons."

*Sterling*, 111 Idaho at 224–25, 723 P.2d at 768–69 (quoting Prosser and Keeton, *The Law of Torts* § 53 (5th ed.1984)) *superseded in part on other grounds*, I.C. § 6–904A. The Court noted that the duty described by Dean Prosser is acknowledged in the Restatement (Second) of Torts, § 319, which provides as follows:

**§ 319. Duty of Those in Charge of Person Having Dangerous Propensities.** One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

Restatement (Second) of Torts, § 319 (1977). The *Sterling* Court found that the key to this duty is the supervising individual's relationship to the supervised individual, rather than a direct relationship with the endangered person or class of persons. The Court stated that "[t]he duty extends to the protection and safety of 'others' foreseeably endangered." *Sterling*, 111 Idaho at 225, 723 P.2d at 769. The Court then expressly held that the duty set forth in § 319 of the Restatement exists in Idaho. *Id.* Thus, there are two components to the duty identified in *Sterling*. The first part requires a determination of whether the supervising body actually has control over the individual in question, and then secondly, if so, a determination must be

made whether the harm caused by the individual was foreseeable.

■ With respect to the first component, the Youth Ranch argues that because Espinoza was not in its care, custody, supervision or control at the time of Patrick Caldwell's murder, it did not owe a duty of care to the Caldwells. It is undisputed that the Youth Ranch did not have custody or control over Espinoza at the time of the murder. Espinoza was released from the Youth Ranch on January 5, 1994, and the murder did not occur until three months later. The Order of Change of Disposition, dated January 26, 1994, signed by the regional director of the Department, expressly changes the custody and placement of Espinoza from the Youth Ranch to Espinoza's father, Ralph. The decision to move Espinoza was a joint decision by the Department and the Youth Ranch.

The Caldwells argue, however, that the Youth Ranch continued to owe a duty to them even after Espinoza's release, based upon a continuing "special relationship" between the Youth Ranch and Espinoza. For support, the Caldwells cite *Semler v. Psychiatric Inst. of Washington, D.C.*, 538 F.2d 121 (4th Cir.1976), a case cited by this Court in *Sterling*. *Sterling*, 111 Idaho at 225, 723 P.2d at 769. *Semler* is distinguishable from the case at bar. In *Semler*, a court order required a probationer to be confined to the Psychiatric Institute of Washington, D.C. After some time, the doctor at the Institute requested that the probationer be transferred to the status of day care patient. The probation officer transmitted the request to the state judge who approved it. Later, the patient wished to be released to relatives in a different state. The doctor approved the request as did the probation officer, who assumed that the judge would approve it also. The probationer was released prior to court approval and two months later he murdered a girl. *Semler*, 538 F.2d at 123–24.

The Fourth Circuit Court of Appeals held that the Institute was liable to the girl's parents for the negligent release of the probationer. The court determined that the de-

cision to release him was not solely a matter of medical judgment, but also required a judgment by the court as to whether his release would be in the best interests of the community. The court thus held:

> The special relationship created by the probation order, therefore, imposed a duty on the [Institute] to protect the public from the reasonably foreseeable risk of harm at [the probationer's] hands that the state judge had already recognized.

*Id.* at 125.

In the present case, neither the Department nor the Youth Ranch violated a court order upon releasing Espinoza. Although the magistrate's decree, dated February 27, 1992, placed Espinoza in the legal custody of the Department and directed placement with the Youth Ranch, the Department was granted discretion with respect to retaining custody pursuant to I.C. § 16–1826.[1] In 1994, that section provided:

> **Period of board's control.**—The board ["board" means state board of health and welfare] shall keep under continued study a person in its control and shall retain him under supervision and control so long as, in its judgment, such control is necessary for the protection of the public.... The board shall discharge a person as soon as, in its opinion, there is reasonable probability that he can be given full liberty without danger to the public.

I.C. § 16–1826 (1994).

The Department had discretion with respect to the timing of Espinoza's release and needed no court approval to do so, unlike *Semler*. There was, therefore, no continuing "special relationship" between the Youth Ranch and Espinoza upon Espinoza's release. Because the Youth Ranch no longer had custody or control of Espinoza at the time of the murder, the Youth Ranch owed no duty to the Caldwells at that time pursuant to *Sterling v. Bloom*, 111 Idaho 211, 723 P.2d 755 (1986).

■ Although the issue of whether Espinoza was in the custody and control of the

---

1. In 1995, this section was amended and redesignated as I.C. § 20–504 with the creation of the

Department of Juvenile Corrections.

Youth Ranch at the time of Caldwell's murder is dispositive, and this Court need not address the issue of foreseeability, we note that it was not foreseeable that Espinoza would commit cold-blooded murder under the influence of illegal substances some three months after being released from the Youth Ranch. *See generally, Harris,* 123 Idaho at 295–96, 847 P.2d at 1156–57.

The Caldwells further argue that the Youth Ranch breached its duty by failing to properly warn the Department about Espinoza's behavioral problems. The Caldwells argue that the Youth Ranch failed to pass on all information about Espinoza in writing. Since we are reviewing a summary judgment motion, we will assume all facts and make all reasonable inferences that can be drawn from the record in favor of the non-moving party. *Rubbermaid,* 129 Idaho at 356, 924 P.2d at 618. Even assuming this allegation is true, we still do not believe that a material issue of fact exists as to whether the Youth Ranch should have foreseen that Espinoza would commit cold-blooded murder while under the influence of illegal substances three months after his release from the Youth Ranch.

The question whether a risk of harm is foreseeable is generally a question for the trier of fact. *Orthman v. Idaho Power Co.,* 130 Idaho 597, 601, 944 P.2d 1360, 1364 (1997); *see also Walenta v. Mark Means Co.,* 87 Idaho 543, 548, 394 P.2d 329 (1964) (the question of foreseeability is regarded as a question of fact for determination by the jury). Summary judgment is appropriate, however, if evidence is presented establishing the absence of any genuine issue of material fact concerning the general risk of harm. *Orthman,* 130 Idaho at 601, 944 P.2d at 1364. In a case in which this Court determined the liability of a government entity under the Tort Claims Act after a juvenile in the custody of the Department of Health and Welfare raped and sodomized a widow, this Court stated the appropriate test to be applied when determining foreseeability. The Court stated that foreseeability, "contemplates more than the mere possibility of aggressive tendencies.... The concept of foreseeability is much more narrowly drawn in this

circumstance, ... *i.e.* violence, particularly of a sexual nature, toward members of the public ... must be manifest or ostensible, and highly likely to occur." *Harris,* 123 Idaho at 299, 847 P.2d at 1160.

Although the *Harris* decision dealt with the standard to be applied in Tort Claims Act cases, we believe that the standard is applicable here for several reasons. The Youth Ranch was performing a function akin to a governmental function in its relationship to Espinoza as his custodian. Further, human behavior is difficult to predict with certainty, leading to the necessity for claimants to demonstrate that the harmful behavior should have been highly predictable based upon demonstrated past conduct. *See Hicks v. United States,* 511 F.2d 407, 417 (D.C.Cir. 1975) ("The standard to be applied, however, must take into consideration the uncertainty which accompanies psychiatric analysis.... The concept of 'due care' in appraising psychiatric problems, ..., must take account of the difficulty often inevitable in definitive diagnosis."); *Soutear v. United States,* 646 F.Supp. 524, 536 (E.D.Mich.1986) (" 'Medical doctors cannot predict with perfect accuracy whether or not an individual will do violence to himself or to someone else.... Thus, a psychiatrist will not be held liable for his patient's violent behavior simply because he failed to predict it accurately.' ") (quoting *Davis v. Lhim,* 124 Mich.App. 291, 335 N.W.2d 481, 487 (Mich.App.1983)); *Wofford v. Eastern State Hospital,* 795 P.2d 516, 520 (Okla.1990) ("Psychiatry is not an exact science, and a psychiatrist will not be held liable for his patient's violent behavior simply because he failed to predict it accurately."); *Higgins v. Salt Lake County,* 855 P.2d 231, 235 (Utah 1993) (recognizing the inability of trained health care professionals to predict future dangerousness.). In fact, in Idaho the legislature does not place liability on mental health professionals for failing to predict human behavior unless explicit threats are made by a patient regarding a specific intended victim. I.C. § 6–1902 ("A mental health professional has a duty to warn a victim if a patient has communicated to the mental health professional an explicit threat of imminent serious physical harm or death to a clearly identified or identifiable victim or

victims, and the patient has the apparent intent and ability to carry out such threat.").

In a case with factual similarities to the case at bar, the Utah Supreme Court held that a state hospital would not be held liable for an automobile accident caused by a mental patient who stole a vehicle after walking off the premises of the hospital. The Utah Supreme Court stated:

> "[i]t strikes us as unsound to place the vitality of transitional programs at risk solely in the interest of finding a solvent defendant responsible for any harm caused by one in custody when custody itself has relatively little correlation to one's dangerousness. All custodial decisions and transitional programs present critical risks to some members of the public, and public acceptance of that risk is part of the legislative policy decision that people who may be dangerous are not to be locked up for life simply because of that potential dangerousness."

*Rollins v. Petersen,* 813 P.2d 1156, 1161–62 (Utah 1991). We agree with the policy statement of the Utah Supreme Court, in that transitional programs should not be expected to incarcerate everyone who has dangerous or violent tendencies for life. Additionally, to subject the Youth Ranch to liability for failing to accurately predict human behavior would put the vitality of the program at risk. Therefore, we believe that to hold the Youth Ranch liable for the acts of Espinoza, the behavior must have been highly predictable. Proof that Espinoza had anger management problems is not sufficient evidence to predict that Espinoza would commit cold-blooded murder under the influence of illegal substances.

The Youth Ranch moved to strike certain evidence submitted by the Caldwells when opposing the summary judgment motion. Specifically, this evidence included an affidavit of Nancy Peterson, a counselor at the Youth Ranch, an affidavit of Officer Rory Olsen, a police officer employed with the Pocatello Police Department, and excerpts from the testimony of Dr. Mark Corgiat and Dr. Peter Heinbecker during Espinoza's sentencing hearing for Patrick Caldwell's murder. The district court did not rule on this motion. We hold that even assuming this evidence was admissible, this evidence did not create a genuine issue of material fact.

In the present case, although there are numerous reports and accounts in the record describing Espinoza's physically aggressive behavior while residing at the Youth Ranch, there is no evidence that Espinoza would be inclined to commit cold-blooded murder while under the influence of illegal substances some three months after being released from the Youth Ranch. It was documented that Espinoza had a tendency to engage in confrontations with other male youths, yet there was never a situation at the Youth Ranch where Espinoza threatened or attempted to kill anyone. The affidavit of Nancy Peterson, which was relied upon heavily by the Caldwells, stated that she believed that Espinoza was dangerous to other youths and staff members at the Youth Ranch and that there was a high risk that Espinoza would harm someone upon being released from the Youth Ranch. This affidavit does not assert that the Youth Ranch was aware that Espinoza was highly likely to commit murder, particularly while under the influence of alcohol and marijuana. Rory Olsen's affidavit asserted that based upon the police records, he suspected the murder of Patrick Caldwell was gang-related and that if Espinoza was aspiring to be a gang leader, it was probable that he would commit a violent crime. Nothing in this affidavit, however, states as fact that the Youth Ranch was aware that Espinoza was in fact aspiring to be a gang leader or that the Youth Ranch should have known that if Espinoza was aspiring to be gang leader, Espinoza would be likely to commit murder under the influence of illegal substances. Additionally, Espinoza never made any statements to anyone at the Youth Ranch, including Nancy Peterson, indicating that he had intentions or plans of committing murder. *Cf. Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 347 (Cal.1976) (psychotherapists liable in wrongful death action due to inaction on their part after patient stated his intention to murder victim.) Although Espinoza was physically restrained several times while at the Youth Ranch, he was described as a difficult

child but not untypical of many of the Youth Ranch residents.

Additionally, the testimony of Dr. Corgiat and Dr. Heinbecker was given at the sentencing hearing for Espinoza after he had committed the murder. Neither of these doctors was familiar with Espinoza while he was at the Youth Ranch, nor were they opining whether Espinoza had exhibited characteristics that would have indicated to the Youth Ranch that Espinoza would commit murder under the influence of illegal substances three months after being released from the Youth Ranch's custody. Although these doctors testified that Espinoza was a juvenile with an anger management problem, and that it was a mistake to release Espinoza from the Youth Ranch, they had no personal knowledge of Espinoza at the Youth Ranch; their testimony was based solely on records and reports provided to them. Therefore, we do not find that this testimony creates a material issue of fact as to whether it was foreseeable that Espinoza would commit cold-blooded murder while under the influence of illegal substances. Without some concrete evidence that Espinoza intended to murder someone, Espinoza's behavior paralleled the behavior of many of the other residents at the Youth Ranch. There was no evidence to indicate that Espinoza was likely to stab another person seventeen times while under the influence of drugs and alcohol.

We hold that the Youth Ranch did not owe a duty that would create tort liability, since Espinoza was no longer in the care, custody, supervision or control of the Youth Ranch at the time of the murder. Further, nothing in the record shows that the Youth Ranch should have predicted Espinoza's murder of Patrick Caldwell. The murder was not highly predictable based upon Espinoza's past conduct. The decision of the district court to grant the Youth Ranch's summary judgment order is affirmed.

**C. The District Court Did Not Abuse Its Discretion In Denying The Youth Ranch's Request For Attorney Fees And Costs.**

■ The Youth Ranch argues that it was entitled to an award of costs and attorney fees at the district court level and that an award of costs is mandatory pursuant to I.C. § 12–101 and I.R.C.P. 54(d)(1)(C).

I.C. § 12–101 provides that "[c]osts shall be awarded by the court in a civil trial or proceeding to the parties *in the manner and in the amount provided for by the Idaho Rules of Civil Procedure.*" (emphasis added). I.R.C.P. 54(d)(1)(A) and (C) provide as follows:

> (A) Parties Entitled to Costs. *Except when otherwise limited by these rules,* costs shall be allowed as a matter of right to the prevailing party or parties, *unless otherwise ordered by the court.*
>
> (C) Costs as a Matter of Right. *When* costs are awarded to a party, such party shall be entitled to the following costs . . .

(emphasis added). This Court has held that any award of costs under this rule is discretionary with the trial court:

> An award of costs under I.R.C.P. 54(d)(1), as the rule itself provides, is committed to the sound discretion of the district court. . . . At oral argument the trial court reviewed the subsections of I.R.C.P. 54(d)(1) and accurately perceived that the assessment of costs awarded to the prevailing party under both subsections (C) and (D) of Rule 54(d)(1) is discretionary with the court.

*Zimmerman v. Volkswagen of America, Inc.,* 128 Idaho 851, 857, 920 P.2d 67, 73 (1996). Thus, the decision to award any costs to the prevailing party in a civil action is entirely within the sound discretion of the district court.

■ Additionally, whether to award attorney fees is also within the trial court's discretion. I.R.C.P. 54(e)(1) states that "[i]n any civil action the court *may* award reasonable attorney fees to the prevailing party or parties as defined in Rule 54(d)(1)(B)." (emphasis added). The determination of the prevailing party is within the sound discretion of the trial court. I.R.C.P. 54(d)(1)(B); *Farm Credit Bank of Spokane v. Wissel,* 122 Idaho 565, 568, 836 P.2d 511, 514 (1992).

Although the district court did not elaborate on its decision to deny the Youth Ranch's request for costs and attorney fees,

it is apparent that the court did not abuse its discretion in denying them. Considering the tragic circumstances of this case, it is clear that the trial court believed that each party should be responsible for its own costs and attorney fees. The trial court stated that, "When a tragedy such as this occurs, I'm sure Patrick Caldwell's parents understand-ably would feel someone must be at fault maybe other than the murderer given the scenario, this history here." The trial court was implying that the interests of justice would not be served by an award of costs and fees. Based on this analysis, we hold that the district court did not abuse its discretion in denying the Youth Ranch's request for costs and attorney fees.

### D. The Youth Ranch Is Not Entitled To Attorney Fees And Costs On Appeal.

■ The standard for awarding attorney fees to the prevailing party on appeal is whether this Court "is left with the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably or without foundation." *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 918, 591 P.2d 1078, 1085 (1979). The Caldwells did not pursue this appeal frivolously, unreasonably or without foundation as this is an area of law which is not well-defined.[2] Therefore, the request for attorney fees on appeal is denied. Costs are awarded to the Youth Ranch on appeal.

### IV.

### CONCLUSION

We hold that the Youth Ranch did not owe a duty to the Caldwells at the time of the murder and therefore, the district court's order granting summary judgment is affirmed. Additionally, we hold that the district court did not abuse its discretion in denying the Youth Ranch's request for costs and attorney fees. Attorney fees are not awarded to either party on appeal as this case was not pursued or defended frivolously,

unreasonably or without foundation. Costs are awarded on appeal to the Youth Ranch.

SCHROEDER and WALTERS, JJ., concur.

SCHROEDER, Justice, specially concurring.

I concur in the reasoning and result of this decision and write only to note that in significant respects this case is parallel to *Doe v. Garcia and Sisters of the Holy Cross*, 578 Idaho 131, 961 P.2d 1181 (1998), which under the logic of this case should have been decided differently.

JOHNSON, Justice, dissenting.

I respectfully dissent from the Court's opinion affirming the trial court's granting of summary judgment in favor of the Youth Ranch.

In my view, both the trial court and this Court have restricted their focus to the lack of continuing custody by the Youth Ranch. In doing so, both the trial court and this Court have failed to focus on one of the primary grounds for the Caldwells' claim against the Youth Ranch. In their amended complaint, the Caldwells alleged, among other grounds for their claim, that the Youth Ranch contributed to the death of Patrick Caldwell when it "[j]ointly participated in the decision to release Santiago Espinoza." R. 59. In their brief opposing the Youth Ranch's motion for summary judgment, the Caldwells argued that the Youth Ranch "has a duty to the public to act safely concerning the discharge of boys which it knows or should know constitute a risk of harming members of the public upon discharge." R. 1077. At the hearing before the trial court on the Youth Ranch's motion for summary judgment, the attorney for the Caldwells told the trial court that he was relying on "cases where a facility had control and the facility made a decision to let the person in their control out." Tr. 48, ll. 21–24. Addressing this ground for the Caldwells' claim against the Youth Ranch, I conclude that there are

---

**2.** Although the Caldwells requested attorney fees on appeal, the Caldwells' request is denied in

view of the outcome of this appeal

genuine issues of material fact concerning the Youth Ranch's duty that preclude the grant of summary judgment in favor of the Youth Ranch.

The evidence presented to the Court in opposition to the Youth Ranch's motion for summary judgment indicates: (1) Espinoza was dangerous to other children and staff at the Youth Ranch, (2) the Youth Ranch failed to tell the Department about the degree of Espinoza's dangerousness, and (3) the Youth Ranch participated jointly with the Department in making the decision whether and when to release Espinoza.

This Court follows the rule that " 'one owes the duty to every person in our society to use reasonable care to avoid injury to the other person *in any situation in which it could be reasonably anticipated or foreseen that a failure to use such care might result in such injury.* ' " *Alegria v. Payonk,* 101 Idaho 617, 619, 619 P.2d 135, 137 (1980) (emphasis in original). Furthermore, there is a "general rule that each person has a duty of care to prevent unreasonable, foreseeable risks of harm to others." *Sharp v. W.H. Moore, Inc.,* 118 Idaho 297, 300, 796 P.2d 506, 509 (1990). In *Rife v. Long,* 127 Idaho 841, 908 P.2d 143 (1995), the Court said:

> Determining whether a duty will arise in a particular instance involves a consideration of policy and the weighing of several factors which include:
>
>> [T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved (citations omitted).

In the context of the summary judgment granted by the trial court in favor of the Youth Ranch, the first question the Court should ask under *Rife* is whether there is a genuine issue of material fact concerning whether the Youth Ranch could have foreseen injury to others as a result of releasing Espinoza. Foreseeability "includes *whatever result is likely enough* in the setting of modern life that a reasonably prudent person would take such into account in guiding reasonable conduct." *Sharp,* 118 Idaho at 301, 796 P.2d at 510 (emphasis added). The evidence concerning Espinoza's dangerousness to others and the Youth Ranch's joint participation in deciding to release him raise a genuine issue concerning whether the Youth Ranch should have foreseen that Espinoza would harm someone after his release. It is not a question concerning a duty of the Youth Ranch to warn the public or someone in particular that they were in danger from Espinoza. The question is whether the Youth Ranch should have facilitated Espinoza's release.

Concerning the closeness of the connection between the Youth Ranch's conduct and the death of Patrick Caldwell, there is no evidence that Patrick had any connection with the Youth Ranch or came in contact with Espinoza there. The three month lapse after Espinoza's discharge before the murder also diminishes the closeness of the connection. These circumstances indicate that there was not any degree of closeness between the Youth Ranch's participation in the discharge and Patrick's murder. Depending on the resolution of the genuine issues of material fact that I see concerning the other considerations in determining whether the Youth Ranch had a duty, this consideration may become significant.

Concerning moral blame, the evidence that the Youth Ranch did not tell the Department about the degree of Espinoza's dangerousness raises a genuine issue whether that information would have changed the Department's decision about releasing Espinoza. If, based on that information, the Department would have decided not to agree to Espinoza's release, there would be a serious question about the moral blame attributed to the Youth Ranch by failing to tell the Department about the degree of Espinoza's dangerousness. Concerning the social policy of preventing future harm, the same analysis applies and there would be a serious question

about whether imposing a duty on the Youth Ranch would be appropriate in light of its failure to tell the Department about the degree of Espinoza's dangerousness.

Concerning the burden that would be placed on the Youth Ranch if a duty is imposed in this case, the evidence indicating the availability of the information at the Youth Ranch about the degree of Espinoza's dangerousness indicates it would not be a heavy burden to require the Youth Ranch to tell the Department about that dangerousness and not to agree to Espinoza's release in light of that dangerousness.

Concerning insurance availability for the risk, the Youth Ranch has not presented any evidence to show it lacks insurance coverage for the risk involved in this case.

In my view, the genuine issues of material fact about the degree of Espinoza's dangerousness and the Youth Ranch's failure to tell the Department about that dangerousness, together with the question whether the Department would have made the decision to release Espinoza if it had been told about that dangerousness, dictate that summary judgment is not appropriate concerning the issue of the duty the Youth Ranch in connection with the release of Espinoza. Whether the Youth Ranch had a duty, depends on the resolution of these genuine issues of material fact.

I would vacate the summary judgment and remand for further proceedings concerning these genuine issues of material fact.

TROUT, C.J., concurs in dissent.